# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **ANTONIO B. MARTIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 16-CV-3294** |
| | ) | |
| **SOUTHERN ILLINOIS UNIVERSITY** | ) | |
| **SCHOOL OF MEDICINE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge.**

This cause is before the Court on the Motion for Summary Judgment (d/e 12) filed by Defendant Board of Trustees of Southern Illinois University.[1]  Plaintiff Antonio B. Martin's Motion for Leave [14] to file his untimely response to the Motion for Summary Judgment is GRANTED.  Because Plaintiff has failed to produce evidence to show that there is evidence upon which a jury could find in his favor, the Motion for Summary Judgment is GRANTED.

---

[1] The Defendant is improperly named "Southern Illinois University School of Medicine" in the Complaint.

# I.  INTRODUCTION

In October 2016, Plaintiff, proceeding pro se, filed a Complaint of Employment Discrimination (d/e 1) on a preprinted form.  Plaintiff was a student in the M.D. program at Southern Illinois University (SIU) School of Medicine before being dismissed. Compl., Statement of Facts ¶ 1.

Plaintiff is a black male who suffers from Attention Deficient Hyperactivity Disorder (ADHD).  Id.  Despite completing the 2014-2015 academic year, Plaintiff was dismissed from the medical school in June 2015 for poor grades.  Id. ¶ 28.  Plaintiff alleges, however, that the causes of his difficulties were Defendant's failure to accommodate his disability, Defendant's falsification of information contained in Plaintiff's student record, Plaintiff's health issues resulting from the hostile environment, and Defendant's practice of assigning African-American students to less-qualified clinical mentors.  Id.  Plaintiff claims that he was discriminated against on the basis of disability in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, and the Rehabilitation Act, 29 U.S.C. § 701; and on the basis of his race

and gender, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e.

Defendant moves for summary judgment. Defendant states that Plaintiff was not an employee of SIU but was a medical student. Defendant further asserts that Plaintiff's use of the form employment discrimination complaint is erroneous and the cited statutes do not apply. Defendant agrees, however, that a recipient of federal funds, like SIU, is prohibited from discriminating against individuals based on race, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d and based on sex, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681. Defendant further agrees that SIU is required to reasonably accommodate a student's disability, Title II of the Americans with Disabilities Act, 42 U.S.C. § 2000a and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701. The Court will address Plaintiff's claims under the statutes identified by Defendant. See Hatmaker v. Memorial Med. Ctr., 819 F.3d 74, 743 (7th Cir. 2010) ("Even citing the wrong statute needn't be a fatal mistake, provided the error is corrected in response to the defendant's motion for summary judgment and the defendant is not harmed by the delay in correction").

Plaintiff's response to the Motion for Summary Judgment was due on August 7, 2017.[2] On August 10, 2017, this Court entered a Text Order noting that Plaintiff had failed to respond to the motion. The Court granted Plaintiff until August 18, 2017 to file a response. The Court also advised Plaintiff that a failure to respond would result in the Court assuming that all of Defendant's undisputed material facts are true. Plaintiff failed to file a response.

On September 1, 2017, the Court noted that the Clerk's office did not send Plaintiff the standard Rule 56 notice that is sent when a motion for summary judgment is filed in a pro se case. The Court directed the Clerk to send Plaintiff the notice and granted Plaintiff until September 15, 2017 to file a response. Plaintiff again failed to file a response.

On Friday, September 22, 2017, Plaintiff filed a Petition for Leave of Court to File Late (d/e 14). Plaintiff asserted that his response was complete but that he did not have the chance to include citations in the filing. The response did not include any

_____

[2] The Court granted Plaintiff's request to electronically file. <u>See</u> February 17, 2017 Minute Entry.

evidentiary support. Plaintiff asked for the opportunity to update the motion so that the citations could be "noted" over the weekend. Plaintiff did not file his updated motion the following Monday, September 25.

On September 26, 2017, the Court entered a text order stating: "Before the Court rules on Plaintiff's motion for leave, the Court grants Plaintiff one last extension of time." The Court directed Plaintiff to file his updated response on or before September 29, 2017. The Court warned Plaintiff that failure to do so would result in the Court denying Plaintiff leave to file his late response. Plaintiff has filed to file an updated response with citations and/or evidence. Nonetheless, the Court will grant Plaintiff's Motion for Leave of Court to File Late (d/e 14) but notes that no evidentiary support has been submitted.

## II. UNDISPUTED MATERIAL FACTS

The Court takes the following facts from Defendant's Statement of Undisputed Facts. Plaintiff's response to Defendant's statement of undisputed facts failed to cite evidentiary documentation for his response, as required by Local Rule 7.1(D)(b)(2). <u>Dale v. Poston</u>, 548 F.3d 563, 568 (7th Cir. 2008)

(although a court must construe pro se pleadings liberally, a pro se party must still follow the procedural rules). Therefore, the facts are deemed admitted.

The Board of Trustees of SIU operates and manages SIU. a public university with campuses in Carbondale, Edwardsville, Springfield, and Alton, Illinois. SIU operates an accredited medical school.

Plaintiff was a student of SIU who attempted to complete the first year of the medical school program three times. The first year of the four-year medical school program is conducted on the Carbondale, Illinois campus. The first year of the school program includes an introduction to professional life as a physician, including basic clinical skills; basic concepts of disease and disorders, which integrate basic sciences; and the development of life-long learning skills. The first year is divided into three units based on body systems: the cardiovascular/respiratory/renal unit; the sensomotor systems and behavior unit; and the endocrine/reproductive/gastrointestinal unit.

Students are evaluated on three broad categories of performance: cognitive academic performance, which includes

concepts of basic anatomy, physiology, and sciences; non-cognitive academic performance, which includes the consistent display of behavior congruent with the standards of the profession such as good judgment, integrity, appropriate interpersonal relations with patients, faculty and peers, self-discipline, and dependability; and "doctoring" which introduces students to applying their knowledge in the setting of simulated patients, focusing on taking and interpreting normal histories and physical findings. Students are graded with a system that assigns a rating of Satisfactory, Concern, or Unsatisfactory to each category on which they are evaluated. A Concern rating is an indication that student performance is less than expected and the student must modify his or her learning activities. A succession of Concern ratings, or an Unsatisfactory rating, may result in recommendations for remediation from the Student Progress Committee.

Each medical student is assigned a clinical mentor during his or her first year as part of the student's clinical skills (doctoring) sessions. While Plaintiff was a student at SIU, a student was expected to spend a minimum of sixteen hours per unit with his or her assigned mentor on at least three different dates, during which

time the student was to learn basic clinical skills such as history taking, use of instruments, physical examinations, and oral case presentations. Students are evaluated by their mentors and, in turn, each student submits a mentor evaluation in January and May. Mentors are not assigned to students based on the race of either the student or the mentor. During Plaintiff's first two years, he was assigned a physician mentor. During Plaintiff's third attempt at the first-year curriculum, he was assigned to Mike Staff, a physician assistant, as a mentor. Mr. Staff is an experienced, highly qualified mentor for SIU's medical students who has consistently received positive evaluations from those students that he has mentored. A total of fifteen students, including Plaintiff, have been assigned to Mr. Staff since the 2003-2004 academic year. Only five of those students self-identified as minorities, four African American and one Latino. Plaintiff gave Mr. Staff a positive evaluation at the end of the 2014-2015 academic year.

The Student Progress System is the system employed by the School of Medicine for considering matters of student progress. The Student Progress Committee is a standing committee within the school responsible for monitoring the progress of all students

through the system.  The Student Progress Committee functions as an advisory body to the Dean and determines whether the established standards of academic conduct have been met.  The Student Progress Committee is composed of a Chair, Vice Chair, ten faculty members from the Springfield campus, four faculty members from the Carbondale campus, five students, and several ex-official members, one of whom is Erik Constance, M.D., the Associate Dean for Students and Admissions.

SIU has an Office of Disability Support Services to provide resources for disabled students pursuant to the Board of Trustee's policies for the protection and accommodation of disabled students.  Medical students who believe they need an accommodation for a disability can contact an appropriate school representative, identifying his or her disability and the requested accommodations.  During Plaintiff's three attempts to pass the first year of medical school, he twice requested one accommodation— extended time on tests.  That request was made during his first and second attempts at the first-year curriculum and was granted both times.

Plaintiff was admitted to the School of Medicine as a first year student for the 2012-2013 academic year (Class of 2016). On September 19, 2012, the Student Progress Committee met and discussed concerns related to Plaintiff's professional conduct reported by Linda Herrold, Assistant Dean for Student Affairs, and Sandra Shea, Ph.D., the Year 1 Curriculum Director. Ms. Herrold and Dr. Shea had submitted to the Student Progress Committee a Concern Note of Non-Cognitive Academic Performance identifying 14 Preliminary Reports of Non-Cognitive Academic Performance. The Concern Note referenced behaviors of Plaintiff related to tardiness, absence from teaching activities, and failure to complete required written assignments and other paperwork. After considering the report of Ms. Herrold and Dr. Shea and Plaintiff's written response, the Student Progress Committee concluded that Plaintiff had failed to abide by the terms and conditions of the School of Medicine Honor Code in the categories of Accountability and Respect for Others. The Student Progress Committee, with the Dean's concurrence, issued Plaintiff a Letter of Academic Warning and advised that further lapses in non-cognitive academic performance would be reviewed by the Student Progress

Committee and could result in academic probation, a leave of absence, or potential dismissal from SIU.

Plaintiff received an overall grade of Concern on his mid-unit cardiovascular/respiratory/renal exam. Plaintiff received grades of Unsatisfactory in embryology and gross anatomy and Concern in pharmacology and respiratory physiology. On November 19, 2012, shortly after the cardiovascular/respiratory/renal exam unit ended, Plaintiff requested a leave of absence for the remainder of the 2012-2013 academic year. Year 1 faculty staff reviewed Plaintiff's request. Year 1 faculty staff recommended to the Student Progress Committee that Plaintiff be granted the option of returning the next year on academic probation subject to certain conditions. The faculty's recommendation and Plaintiff's request for a leave of absence were reviewed by the Student Progress Committee on November 28, 2012 and approved on a vote of 16-1.

On December 4, 2012, Plaintiff was advised in writing of the approval of his request. A Letter of Academic Warning was sent to Plaintiff advising him that, if he chose to return with the Class of 2017, he would be placed on academic probation with the following terms of probation: (1) he must not receive any Preliminary Reports

or Concern Notes related to non-cognitive academic performance; and (2) he must receive a non-cognitive behavior and professionalism performance rating (grade) of Satisfactory (not Concerns or Unsatisfactory) for each of the three units in his repeat of the Year 1 Curriculum. Plaintiff was also instructed to meet with Ms. Herrold prior to his return to discuss the serious concerns of the Student Progress Committee as well as the requirements of his academic probation.

Plaintiff returned to SIU in August 2013 to attempt the first year of medical school again. As advised by the Student Progress Committee in December 2012, Plaintiff returned on academic probation with the conditions outlined in the December 4, 2012 letter.

At its October 16, 2013 meeting, the Student Progress Committee again discussed Plaintiff's professional conduct since returning in August 2013. Faculty members reported Plaintiff's repeated tardiness to his tutor group sessions and tardiness to the Professional Development Lab.

The Student Progress Committee noted that Plaintiff's conduct constituted a violation of his academic probation and that

a meeting to consider his dismissal from the school could be scheduled.  However, the Student Progress Committee unanimously voted to allow Plaintiff to remain in school but sent him another Letter of Academic Warning.  That letter advised Plaintiff that the Student Progress Committee was seriously concerned about his lapses in professional conduct.  The Student Progress Committee instructed Plaintiff to meet with Ms. Herrold to discuss the concerns of the Student Progress Committee and encouraged him to meet with Dr. Wes McNeese from the Office of Diversity.

The cardiovascular/respiratory/renal unit ended on November 22, 2013.  At the end of that unit in 2013, Plaintiff's overall grade was Unsatisfactory (with the lowest score in the class) with Unsatisfactory grades in anatomy, embryology, biochemistry, immunology, and renal physiology and Concerns in pharmacology, behavioral and social sciences, cardiovascular physiology, and respiratory physiology.  Plaintiff also received a rating of Unsatisfactory in doctoring.  Based on his performance, the Year 1 faculty recommended that Plaintiff be dismissed from the School of Medicine.  At its December 18, 2013 meeting the Student Progress

Committee again discussed Plaintiff's performance and the Year 1 faculty's recommendation. The Student Progress Committee noted that, in addition to Plaintiff failing academics, he had also received another Concern Note dated December 9, 2013, submitted by Linda Herrold, identifying several non-cognitive deficiencies relating to tardiness and failure to timely turn in work.

During the approximately five months of the 2013-2014 academic year that Plaintiff attended, the only accommodation he requested for a disability was for extended time on tests. Plaintiff took advantage of the accommodation during a cardiovascular/respiratory/renal unit exam in 2013. He was placed in a separate room for the exam. The exam was a computer exam. Due to limitations associated with the facility, the number of students, and the length of the exam, Plaintiff was scheduled for the morning shift of the exam. Because Plaintiff was granted more time to take the exam than his classmates, Dr. Shea explained to Plaintiff that he could not start the examination with his classmates without having the other students get up and leave and without having people come in for the afternoon shift during his extended time. When Plaintiff and Dr. Shea discussed these

circumstances, Plaintiff agreed that it would be too distracting to have the class rotating around him. The only alternative was to place Plaintiff in a separate, quiet room. The purpose of placing Plaintiff in a room by himself for the cardiovascular/respiratory/rental exam was to ensure that Plaintiff was provided with an environment free from distractions to allow him all of the time he had requested to complete the examination without the class rotating around him. This was explained to Plaintiff both before and during the dismissal hearing.

During the exam, faculty checked on Plaintiff to see whether he had any questions about the content of the exam or any questions about the questions. Plaintiff did not indicate to Dr. Shea or to any other SIU faculty member, to Dr. Shea's knowledge, any dissatisfaction or concerns with the accommodation that was provided at any time prior to the dismissal hearing on June 19, 2015, when he complained about being in a room by himself and being distracted by faculty members who came in to check on him.

On December 13, 2013, Plaintiff submitted a request for a medical leave of absence effective December 18, 2013, for the remainder of the 2013-2014 academic year. Following a

discussion of his academic performance record, the Student Progress Committee voted to approve Plaintiff's request for medical leave for the remainder of the academic year. The Committee modified the conditions of Plaintiff's academic probation to require that Plaintiff provide written documentation from his treating primary care physician and psychiatrist that he was fit to participate in the curriculum and would meet all technical standards of the School of Medicine. The written documentation had to be submitted to Dr. Constance no later than July 1, 2014, if Plaintiff intended to return to attempt the first year of medical school for the third time. If Plaintiff provided the required documentation, he would be permitted to re-enter the medical school with the class of 2018 to repeat Year 1 in its entirety on academic probation, with the following conditions:

a. Plaintiff must receive a basic science knowledge performance rating (grade) of Satisfactory (not Concerns or Unsatisfactory) for each of the three academic units (cardiovascular/respiratory/renal; sensomotor systems and behavior; and endocrine/reproductive/ gastrointestinal) in the Year 1 curriculum;

b. Plaintiff must receive a clinical skills and clinical reasoning performance rating (grade), of Satisfactory (not Concerns or Unsatisfactory) in the doctoring curriculum for each of the three units in the Year 1 curriculum;

c. Plaintiff must receive a non-cognitive behavior and professionalism performance rating (grade) of Satisfactory (not Concerns or Unsatisfactory) for each of the three units in the Year 1 curriculum; and

d. Plaintiff could not receive any additional Preliminary Reports or Concern Notes of non-cognitive academic performance.

The Student Progress Committee vote was 10 in favor and 1 opposed.

On December 20, 2013, the Chair of the Student Progress Committee sent Plaintiff a Letter of Academic Warning/Academic Probation. The letter advised Plaintiff that the Student Progress Committee continued to have very serious concerns about Plaintiff's academic performance deficiencies. The letter emphasized that any violation of the requirements of Plaintiff's

academic probation would cause the Student Progress Committee to take further action, including the reconsideration of Plaintiff's dismissal from the School of Medicine.

At the July 16, 2014 meeting, the Student Progress Committee again discussed Plaintiff's academic performance record. The Committee noted that Plaintiff submitted the written documentation from his primary care physician and psychiatrist as required. Therefore, the Student Progress Committee voted unanimously to permit Plaintiff to reenter the School of Medicine to attempt the first year curriculum for the third time with the conditions of academic probation outlined above.

On July 17, 2014, the Chair of the Student Progress Committee sent Plaintiff a letter acknowledging that Plaintiff had provided the required written documentation from his physicians. The letter reiterated the terms of his academic probation for Plaintiff's third attempt at the first year of medical school.

At the end of the cardiovascular/respiratory/renal unit in the fall of 2014, Plaintiff had an overall grade of Concern on his basic science exam, a grade of Unsatisfactory in doctoring, and had received an additional Concern Note regarding repeated tardiness.

Each of those events constituted another violation of the terms of Plaintiff's academic probation.

The Year 1 faculty recommended that the Student Progress Committee call for a dismissal hearing. At its December 17, 2014 meeting, the Student Progress Committee discussed Plaintiff's academic performance. A motion was made to approve the Year 1 faculty recommendation to convene a dismissal hearing, which failed on a vote of 5 in favor, 8 opposed, and 1 abstention.

The Student Progress Committee continued to express concerns regarding Plaintiff's academic performance deficiencies. The Committee voted to send Plaintiff another letter of academic warning and to retain him on academic probation, emphasizing that a further violation of the requirements of his academic probation would cause the Student Progress Committee to take further action including reconsideration of his dismissal from the School of Medicine. On December 19, 2014, the Chair of the Student Progress Committee sent Plaintiff a copy of the Letter of Academic Warning/Academic Probation.

The Student Progress Committee again discussed Plaintiff's professional conduct at its January 21, 2015 meeting. Between

December 16, 2014 and January 21, 2015, additional Preliminary Reports of Non-Cognitive Academic Performance had been submitted regarding Plaintiff's conduct. This included Plaintiff appearing to fall asleep in class on one occasion, not returning to school on time following the holiday break, tardiness, and forgetting his equipment for a simulated patient examination.

The Student Progress Committee noted at its January 21, 2015 meeting that, by receiving multiple Preliminary Reports of Non-Cognitive Academic Performance, Plaintiff had again violated the requirements of his academic probation. Nonetheless, the Committee voted to allow Plaintiff to remain in the curriculum and to be retained on academic probation. Plaintiff was again reminded that students were required to conform to the standards of professional conduct and that further incidents of non-cognitive academic performance would be reviewed by the Student Progress Committee. The Student Progress Committee required that Plaintiff meet with Dr. Constance to discuss the Committee's concerns and to review the terms of his academic probation.

On February 11, 2015, Dr. Regina Kovach, Chair of the Student Progress Committee, received information from two of

Plaintiff's classmates and his faculty tutor group leader suggesting that Plaintiff may have violated the School's Honor Code by presenting work during a tutor group as his own work, when it was actually work done by others.  Dr. Kovach wrote to Plaintiff on February 12, 2015, advising him of the reports and that an investigatory team of two faculty members and one student would be appointed to review the information, meet with him and the complaining parties, and make a recommendation to the Student Progress Committee.  On March 2, 2015, Dr. Kovach received information from one of the two students who had reported Plaintiff's conduct that, following her letter to him of February 12, 2015, Plaintiff engaged in further conduct potentially in violation of the Honor Code, specifically deleting information from a web-based site used by his tutor group to share information with one another. Dr. Kovach wrote to Plaintiff on March 5, 2012, advising him of the additional report and that the investigatory team would review the additional report as well.

At the March 18, 2015 meeting, the Student Progress Committee discussed Plaintiff's academic performance.  Plaintiff received an end-of-unit basic science grade of Unsatisfactory with

academic performance weaknesses noted in the following areas: Unsatisfactory in physiology, population health, neuroanatomy, gross anatomy and histology and Concerns in behavior and social sciences, biochemistry, genetics and pharmacology. The Student Progress Committee also discussed Plaintiff's professional conduct, noting Plaintiff's continued tardiness and Plaintiff missed a required child abuse session.

Student Progress Committee noted that, by receiving a basic science grade of Unsatisfactory on the sensomotor systems and behavior unit and receiving multiple Concern Notes and Preliminary Reports of Non-Cognitive Academic Performance, Plaintiff had again violated the terms of his academic probation. The Student Progress Committee voted that grounds may exist to dismiss Plaintiff from the School of Medicine for reasons of unsatisfactory academic performance and to schedule a special meeting to consider Plaintiff's dismissal.

On March 27, 2015, Dr. Kovach wrote a twelve-page letter to Plaintiff summarizing his academic performance, including as attachments the Student Progress System document, a notebook with all materials relevant to his academic performance. The letter

advised Plaintiff that the Student Progress Committee would convene a hearing to consider his dismissal from the School of Medicine. At Plaintiff's request, the meeting was continued until June 19, 2015, after the end of the academic year, to allow him time to concentrate on completing the remainder of the academic year before appearing at the dismissal hearing. Plaintiff was advised of his right to have an advisor present with him at the hearing, his right to appear and present witnesses, and his right to submit a written statement in advance to the Committee.

On May 20, 2015, the Student Progress Committee convened a hearing to consider whether Plaintiff had violated the School's Honor Code in connection with the reports of his classmates and tutor group leader. On June 2, 2015, Dr. Kovach wrote to Dean J. Kevin Dorsey, the Dean of the School of Medicine. Dr. Kovach advised that, based on the documentation and testimony presented at the hearing, the Student Progress Committee could not determine whether Plaintiff had truly represented the work of his classmates as his own. Therefore, the first charge could not be substantiated.

With regard to the second charge—deleting information from the web-based site used by Plaintiff's tutor group—the Student Progress Committee determined that Plaintiff had stated that his intent was only to remove himself from the shared information. Plaintiff stated he was unaware that his actions would affect the other students' access to the material and that the effect on the other students' access was a mistake and unintentional. The Student Progress Committee concluded that Plaintiff's action demonstrated poor judgment and was inappropriate and unprofessional. The Committee recommended that Plaintiff's academic probation be modified to also include the condition that he not receive any further reports of unprofessional conduct.

On June 4, 2015, Dr. Kovach wrote to Plaintiff, advising him of the Student Progress Committee's conclusions and recommendation, that the Dean concurred, and that the terms of his academic probation would be modified to include the additional condition that he not receive any further reports of unprofessional conduct. However, by June 2, 2015, Plaintiff was also scheduled for a Student Progress Committee hearing on June 19, 2015 to

consider his dismissal for violation of his academic probation with respect to his academic failings.

On June 19, 2015, the Student Progress Committee convened the hearing to consider the dismissal of Plaintiff from the School of Medicine based on Plaintiff's unsatisfactory academic performance. At the beginning of the hearing, Dr. Kovach verbally outlined the record of Plaintiff's academic performance during the three years Plaintiff attempted the first year medical school curriculum. At the end of Dr. Kovach's summary, Plaintiff was specifically asked if there were "any factual corrections that [he] would like to make in this account of [his] academic performance." Plaintiff responded "No."

At the dismissal hearing, the Student Progress Committee called three witnesses. Dr. Sandra Shea, Year 1 curriculum director; Dr. Chris Anderson, Director of Doctoring for the Year 1 curriculum; and Dr. Gregory Rose, the tutor group leader for the sensomotor systems and behavior unit. After the testimony of the three witnesses, the Student Progress Committee members then questioned Plaintiff regarding his explanation for his academic performance.

On June 24, 2015, Dr. Kovach sent a letter to Dr. J. Kevin Dorsey, Dean and Provost of the School of Medicine, advising that, after meeting on June 19, 2015 to consider Plaintiff's dismissal from the School of Medicine, reviewing extensive documentary information and hearing the testimony of witnesses, the Committee had voted unanimously to approve a motion to dismiss Plaintiff from the School of Medicine for unsatisfactory academic performance and violation of his academic probation.

On June 29, 2015, Dean Dorsey, after reviewing the recommendation of the Student Progress Committee and the entire record of Plaintiff's performance, decided that Plaintiff should be dismissed from the School of Medicine for reasons of unsatisfactory academic performance. Plaintiff had more non-cognitive performance issues than any other member of his class in each of the academic years that he attended SIU. He also struggled in the areas of cognitive academic performance and doctoring. During Dr. Constance's tenure as Associate Dean and Dr. Shea's tenure at SIU, no student with a record of academic performance similar to Plaintiff was permitted to remain at SIU, regardless of the student's race, gender or disability status.

## III. LEGAL STANDARD

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). The Court must construe the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor.  Blasius v. Angel Auto., Inc., 839 F.3d 639, 644 (7th Cir. 2016).

The movant bears the initial responsibility of informing the Court of the basis for the motion and identifying the evidence the movant believes demonstrates the absence of a genuine dispute of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A genuine dispute of material fact exists if a reasonable trier of fact could find in favor of the nonmoving party.  Carroll v. Lynch, 698 F.3d 561, 564 (7th Cir. 2012).

When the nonmoving party bears the ultimate burden of persuasion on a particular issue, the movant need only show there is an absence of evidence to support the nonmoving party's case. Modrowski v. Pigatto, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting Celotex, 477 U.S. at 325).  The nonmoving party must then

produce evidence, such as affidavits, depositions, or answers to discovery, to show that there is evidence upon which a jury could find in his favor.  Modrowski, 712 F.3d at 1169 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986)).  The nonmoving party cannot rest on the allegations in his complaint but must offer support for those allegations.  See Mosley v. City of Chi., 614 F.3d 391, 400 (7th Cir. 2010).  In addition, a district court is "not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion."  Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 898 (7th Cir. 2003); Greer v. Bd. of Educ. of City of Chi., Ill., 267 F.3d 723, 727 (7th Cir. 2001) (noting, in a pro se case, that employment discrimination cases are fact-intensive, that a court is not required to scour the record looking for factual disputes, and "a lawsuit is not a game of hunt the peanut").  The Seventh Circuit has described summary judgment as the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince the trier of fact to accept its version of the events.'"  Steen v. Myers, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting Hammel v. Eau Galle Cheese Factory, 407 F.3d 852, 859 (7th Cir. 2005)).

# IV. ANALYSIS

The Court notes that Plaintiff's admission of the facts set forth in the motion for summary judgment does not necessarily make a grant of summary judgment appropriate. The Court must still find that Defendant is entitled to judgment as a matter of law. See Wienco, Inc. v. Katahn Assocs., Inc., 965 F.2d 565, 568 (7th Cir. 1992). The Court finds that Defendant is entitled to judgment as a matter of law.

## A. Defendant is Entitled to Summary Judgment on Plaintiff's Race and Sex Discrimination Claims

As noted above, the Court construes Plaintiff's race discrimination claim as having been brought under Title VI of the Civil Rights Act and the sex discrimination claims as having been brought under Title IX of the Education Amendments of 1972.

Title VI of the Civil Rights Act prohibits discrimination on the basis of race by a recipient of federal funds:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d.  Title VI only prohibits intentional discrimination.  <u>Alexander v. Sandoval</u>, 532 U.S. 275, 280 (2001).

To avoid summary judgment, Plaintiff must present evidence sufficient to permit a reasonable jury to conclude that Defendant dismissed him from the School of Medicine because of Plaintiff's race.  <u>See</u>, <u>e.g.</u>, <u>Ortiz v. Werner Enter., Inc.</u>, 834 F.3d 760, 765 (7th Cir. 2016) (involving an employment discrimination case under Title VII and discarding the practice of distinguishing between direct and indirect evidence).  The legal standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."  <u>Id.</u>

The <u>McDonnell Douglas</u> framework, which applies to Title VI cases, remains a method of assessing the evidence in discrimination cases, but it is not the only way to assess circumstantial evidence of discrimination.  <u>David v. Bd. or Trustees of Cmty. Coll. Dist. No. 508</u>, 846 F.3d 216, 224 (7th Cir. 2017) (but also assessing the evidence cumulatively to determine whether it permits a reasonable factfinder to determine that the adverse

action was attributable to the plaintiff's age, race, or sex); see also Andriakos v. Univ. of S. Ind., 867 F. Supp. 804, 80910 (S.D. Ind. 1992) (applying Title VII standards to Title IX) aff'd 19 F.3d 21, at *4 (7th Cir. Feb. 17, 1994) (unpublished) (comparing Title IX to Title VI cases, noting that other courts have applied McDonnell Douglas framework to Title VI claims, and finding the district court correctly relied on McDonnell Douglas); Rashdan v. Geissberger, 764 F.3d 1179, 1182 (9th Cir. 2014) (joining the Third, Eighth, Tenth, and Eleventh Circuits in finding that the McDonnell Douglas framework applies in Title VI cases).

Here, Defendant addresses the evidence using the McDonnell Douglas framework. Under that framework, Plaintiff must meet the initial burden of establishing a prima facie case of discrimination. McKinney v. Office of Sheriff of Whitley Cnty., 866 F.3d 803, 807 (7th Cir. 2017). The prima facie case in the educational context requires that a plaintiff establish that: (1) he is a member of a protected class; (2) he was meeting the school's legitimate educational expectations; (3) an adverse educational action was taken against the plaintiff; and (4) the plaintiff was treated worse than similarly situated students who are not in the

protected class.  <u>Brewer</u>, 479 F.3d at 921.  Once a plaintiff

establishes a prima facie case, a presumption of discrimination

arises, and the defendant bears the burden of articulating a

legitimate, nondiscriminatory reason for the adverse decision.

<u>McKinney</u>, 866 F.3d at 807.  If the defendant does so, the burden

shifts back to the plaintiff, who must present evidence that the

stated reason was a pretext. <u>Id.</u>

Defendant does not dispute that Plaintiff is a member of a

protected class or that he suffered an adverse educational action.

Defendant argues, however, that Plaintiff cannot establish a prima

facie case because he was not meeting Defendant's legitimate

educational expectations and because no similarly situated

individual who was not in the protected class was treated more

favorably.  The Court agrees.

Defendant has submitted uncontradicted evidence that

Plaintiff was not meeting Defendant's legitimate educational

expectations.  Plaintiff was on academic probation from early in his

medical school enrollment until his dismissal.  Plaintiff received

multiple letters of warning from the School based on his academic

and non-academic performance during his first two attempts at

completing the first-year curriculum. In his third attempt to complete the first-year curriculum, Plaintiff violated the terms of his academic probation due to his pattern of tardiness and lack of preparation. Plaintiff also failed to achieve satisfactory grades in numerous classes, as well as the doctoring skills program. Plaintiff fails to point to any evidence showing otherwise.

The record is also devoid of any evidence that a similarly situated student not in the protected class was treated more favorably. Defendant submitted evidence that no student with a record of academic performance similar to Plaintiff was permitted to remain in school, regardless of the student's race, gender, or disability status. See Dr. Constance Aff. ¶ 36 (d/e 12-1).

Therefore, Plaintiff cannot establish a prima facie case of race discrimination. See e.g., Traylor v. Brown, 295 F.3d 783, 790 (7th Cir. 2002) (holding, in a discrimination case, that the "failure to establish one element of her prima facie case . . . is enough to support a grant of summary judgment to her employer). Defendant is entitled to summary judgment on Plaintiff's Title VI claim.

Similarly, Plaintiff cannot establish a prima facie case of sex discrimination under Title IX.  Title IX prohibits any education program or activity receiving federal financial assistance from discriminating on the basis of sex.  20 U.S.C. § 1681; <u>Doe v. St. Francis Sch. Dist.</u>, 694 F.3d 869, 870 (7th Cir. 2012).  The <u>McDonnell Douglas</u> framework applies to Title IX sex discrimination cases.  <u>Hiatt v. Colo. Seminary</u>, 858 F.3d 1307, 1315 n.8 (10th Cir. 2017) (holding that the <u>McDonnell Douglas</u> framework applies to Title IX sex discrimination cases); <u>Andriakos</u>, 867 F. Supp. at 809 (applying Title VII standards to a Title IX claim), <u>aff'd</u> 19 F. 3d 21.

To establish a prima facie claim of sex discrimination under Title IX, Plaintiff must show: "(1) he was in the protected class, (2) he was performing the academic requirements well enough to meet his educator's legitimate expectations, (3) he suffered adverse treatment, and (4) the educational program continued to instruct and credit other students." <u>Andriakos</u>, 867 F.Supp. at 10.  As was the case with Plaintiff's race discrimination claim, Plaintiff has not pointed to any evidence that he was meeting Defendant's legitimate expectations.  Because a reasonable jury could not conclude that

Defendant dismissed Plaintiff from School of Medicine on the basis of his gender, Defendant is entitled to summary judgment on Plaintiff's Title IX claim.

## B. Defendant is Entitled to Summary Judgment on Plaintiff's Failure-to-Accommodate Claim

Plaintiff also alleges that Defendant failed to accommodate his disability as required by the ADA and the Rehabilitation Act. <u>See Washington v. Ind. High Sch. Athletic Ass'n, Inc.</u>, 181 F.3d 840, 847 (7th Cir. 1999) (noting that discrimination under the Rehabilitation Act and Title II of the ADA may be established by evidence that the defendant refused to provide a reasonable accommodation).

Both the ADA and the Rehabilitation Act prohibit discrimination against the disabled. Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, the Rehabilitation Act provides that no qualified individual with a disability shall, solely by reason of his disability,

"be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]"  29 U.S.C. § 794.  Other than some minor differences not relevant here, the statutes are coextensive.  CTL ex rel. Trebatoski v. Ashland Sch. Dist., 743 F.3d 524, 528 (7th Cir. 2014); see also Washington, 181 F.3d at 846 n.6 (noting that the chief differences are that the Rehabilitation Act only applies to entities that receive federal funding and requires that the exclusion be solely by reason of disability).  Defendant agrees that it is obligated to reasonably accommodate students with disabilities pursuant to Title II of the ADA and Section 504 of the Rehabilitation Act.  Mem. at 28; see also Washington, 181 F.3d at 847-48 (the prohibition on discrimination in Title II of the ADA and Section 504 of the Rehabilitation Act requires that the entity provide a reasonable accommodation).

To avoid summary judgment, Plaintiff must submit evidence that (1) he is a qualified individual with a disability, (2) Defendant was aware of his disability, and (3) Defendant failed to provide him with a reasonable accommodation.  See Hoffman v. Caterpillar, Inc., 256 F.3d 568, 572 (7th Cir. 2001).  As for the third element,

the employer and employee must engage in an interactive process to determine a reasonable accommodation.  E.E.O.C. v. Sears, Roebuck & Co., 417 F.3d 789, 797 (7th Cir. 2005) (ADA case).  If Plaintiff shows that his disability was not reasonably accommodated, Defendant is liable only if Defendant is responsible for the breakdown of the interactive process.  See id. (modified for the educational context).

Defendant argues that the undisputed facts show that Plaintiff is not a qualified individual with a disability and that the accommodation provided to Plaintiff was reasonable.  Defendant further argues that, even if the Court finds that the accommodation was not reasonable, Plaintiff's failure to accommodate claim must still fail because Defendant did not cause any breakdown of the interactive process.

The Court finds that the undisputed evidence shows that the accommodation was reasonable and, even if the accommodation were not reasonable, Defendant did not cause any breakdown in the interactive process.  Therefore, the Court does not address Defendant's argument that Plaintiff is not a qualified individual with a disability.

Plaintiff requested an accommodation in his first and second attempts to complete Year 1 of medical school. Plaintiff requested extended time on tests, and the request was granted.

Plaintiff took advantage of the accommodation during the cardiovascular/respiratory/renal unit exam in 2013. The exam was a computer exam and was given in two shifts—a morning shift and an afternoon shift. When Plaintiff and Dr. Shea discussed the circumstances of the test, Plaintiff agreed that it would be too distracting to have the class rotating around him. Therefore, Plaintiff was placed in a separate, quiet room to take the exam. During the exam, faculty checked on Plaintiff to see if he had any questions. Plaintiff did not express any dissatisfaction with the accommodation until his dismissal hearing on June 19, 2015, when he complained about being in a room by himself and being distracted by faculty members who came in to check on him.

No evidence suggests that Defendant failed to reasonably accommodate Plaintiff. Defendant granted Plaintiff the accommodation he sought. See Dean v. Univ. at Buffalo Sch. Of Med. & Biomedical Scis., 804 F.3d 178, 188 (2nd Cir. 2015 ) ("It is axiomatic that a claim for failure to accommodate does not lie

where the accommodation received is the accommodation the plaintiff requested.").

Moreover, liability generally does not attach if the plaintiff does not request an accommodation or does not provide sufficient information for the defendant to determine a reasonable accommodation. Jovanovic v. In-Sink-Erator Div. of Amerson Elec. Co., 201 F.3d 894, 899 (7th Cir. 2000); Reeves ex rel. Reeves v. Jewel Food Stores, Inc., 759 F.3d 698, 702 (7th Cir. 2014) (an employer cannot be liable for failing to accommodate a disabled employee if the employee does not provide sufficient information to the employer to determine a reasonable accommodation). Plaintiff did not advise Defendant of his dissatisfaction with the accommodation provided until the dismissal hearing.

The Court also finds that the undisputed evidence shows that, even if the accommodation provided were not reasonable, Defendant did not cause the breakdown in the interactive process. Plaintiff did not advise Defendant of his dissatisfaction with the accommodation until his dismissal hearing. Therefore, Defendant is entitled to summary judgment on Plaintiff's failure-to-accommodate claim.

The Court also construes Plaintiff's complaint as raising a race, gender, and/or disability harassment claim.  However, Plaintiff has submitted no evidence on such a claim sufficient to raise a genuine issue of material fact.

## V. CONCLUSION

For the reasons stated, Plaintiff Motion for Leave of Court to File Late (d/e 14) is GRANTED.  Defendant's Motion for Summary Judgment (d/e 12) is GRANTED.  All pending deadlines and hearing are VACATED.  This case is closed.

**ENTER: October 23, 2017**

**FOR THE COURT:**

$s/Sue\ E.\ Myerscough$
**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**